John J. HALKO, Jr., Petitioner,

v.

Raymond W. ANDERSON, Respondent.

No. 39.

United States District Court

D. Delaware.

July 29, 1965.

Frederick Knecht, Jr., Wilmington, Del., for petitioner.

Ruth M. Ferrell, Deputy Atty. Gen., Wilmington, Del., for respondent.

LAYTON, District Judge.

Petitioner is under sentence of the Superior Court of Delaware for driving a motor vehicle while under the influence of intoxicating liquor, and for driving while his license was revoked. He seeks relief in this Court on a writ of habeas corpus. The recitation of facts by the Supreme Court of Delaware in Halko v. Anderson, 204 A.2d 628, 629–630 (1964) is fair and comprehensive. For the purpose of convenience it is repeated here:

"On October 18, 1959, one Forestieri was driving his automobile in the environs of the City of Wilmington at about 1:30 a. m. In front of him he observed an automobile which he thought to be a Cadillac weaving from side to side. This car pulled off to the side. Forestieri passed it and as he did so saw Halko, the appellant, at the wheel. Forestieri continued on and stopped for a red light at which time in his rear-view mirror he saw the other car coming up behind him. Sensing the danger of a collision, he started to drive through the red light but his car was struck by the car driven by Halko. Property damage to Forestieri's car was slight.

"The car driven by Halko stopped briefly after the accident, started up and passed in front of Forestieri's car. Forestieri again recognized Halko as the driver. He noted the license number of Halko's car and followed it to South duPont Road where it turned left followed by Forestieri. Halko's car finally turned right into Valley Road but Forestieri continued straight on to the Park Cab Company's office where he stopped and reported the circumstances to one Perry, including the license number of the car which had struck his. Perry made a call to the Wilmington Police at about 1:40 a. m. reporting the incident. Forestieri then returned to Valley Road looking for Halko's car and located it parked in front of 15 Brookside Drive, Halko's place of business. He observed Halko slumped at the wheel of his car. The headlights of Halko's car were on, the windows and doors were closed but the motor was not running.

"Forestieri then returned to the office of the Park Cab Company and told Perry that he had located the car and its location. He then returned to 15 Brookside Drive and waited for the police to arrive. Actually, Forestieri then, or at some subsequent time, learned that Halko's car was not a Cadillac but was in fact a blue 1959 Chrysler.

"Thereafter, Perry came to 15 Brookside Drive and found only Forestieri there. Perry went to look for the Wilmington City Police and returned at about 2:15 a. m. with two officers who had previously tried to locate the accident which had been reported earlier by Perry in response to Forestieri's request and broadcast on the Wilmington police radio. The City Police did nothing. They waited on the scene since the site was outside of the city limits. About 15 minutes later two State Police Officers, Klair and Stoops, arrived. They found Halko slumped over the wheel of the Chrysler parked on the scene. They were unable to arouse him and accordingly opened the door and ultimately removed him from his car. An empty wine bottle was observed between his legs. In their opinion he was drunk. In view of their inability to get an intelligent answer from Halko or ascertain his identity, they handcuffed him, put him into the police car and took him to Troop No. 2 Station where he was locked up for the balance of the night and charged the next morning with driving while under the influence of liquor on a warrant executed by Fores-

tieri. At 2:41 a. m. the State Police Officers reported by radio to Troop No. 2 that they were returning with Halko in their custody.

"Halko's defense was alibi. His alibi was attempted to be established by himself and other witnesses. In brief, it was that he, in the company of friends, had gone to a movie earlier that evening and returned to his place of business sometime prior to 11 o'clock in order to perform some necessary work. Halko, whose license incidentally had been revoked as a result of a prior conviction, testified, supported by his witnesses, that he had never driven his car that night. While at his place of business Halko received numerous telephone calls from a Mrs. Janes who called him several times between 12:30 a. m. and 1:45 a. m., and also from his former wife who called him between 1:00 and 1:30 a. m. and again about 1:50 to 2:00 a. m." [While admitting the police found him on the front seat of his car at his place of business about 2:00 a. m., he denied he was drunk or had driven the car that evening. He said one Lombardi was driving him because his license had been revoked and he was sitting in the car waiting for Lombardi to come and drive him home.]

"On these facts the case was submitted to the jury and Halko was found guilty. It is obvious that the jury rejected his evidence as to alibi and believed the testimony offered by Forestieri and the police officers."

Seven grounds are set forth to support a grant of the writ:

1) That he was deprived of a fair trial in violation of the Fifth and Fourteenth Amendments of the Constitution because the State prosecutor marked for identification a wine bottle and allowed the wine bottle to remain in the presence of the jury for a day of trial, even though the prosecutor knew that he would not be able to introduce the wine bottle into evidence.

2) That he was deprived of a fair trial in violation of the Fifth and Fourteenth Amendments of the Constitution because the trial court did not admonish the jury not to read newspaper articles or listen to radio broadcasts about the pending trial.

3) The Petitioner was deprived of rights under the Constitution when he was sentenced under 21 Del.Code, Ch. 41, after the Legislature had repealed that chapter of the laws of Delaware.

4) That he was deprived of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of the Constitution when the trial judge gathered material and introduced it into evidence at the hearing on the Petitioner's Motion to Suppress Evidence.

5) That he was deprived of a fair trial in violation of the Fifth and Fourteenth Amendments to the Constitution because the trial court did not allow petitioner's counsel to use two accident reports, prepared by police officers, in cross-examining the police officers.

6) That he was deprived of rights under the Fourth, Fifth and Fourteenth Amendments of the Constitution because evidence which was used to convict petitioner was seized without a search warrant when the petitioner was taken into custody parked on private property owned by the petitioner.

7) That he was deprived of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution because the Petitioner was detained for approximately eight hours before he was arrested or apprised of the charges against him.

## WHETHER THIS COURT SHOULD EXERCISE JURISDICTION

The State urges that this Court should not exercise jurisdiction because the petitioner has not "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254. The State points out that the petitioner has not pursued habeas corpus in the State courts. Although 28 U.S.C. § 2254 restricts the grant of habeas corpus, it does not prevent a federal court from acting on the merits of a writ of habeas corpus if there is no effective process re-

maining in the State courts. Most of the arguments presented by the petitioner have been rejected by the Supreme Court of Delaware. Requiring the petitioner to reargue these matters in state habeas corpus proceedings would put the petitioner to a ritualistic exercise in futility, and, therefore, they need not be remanded for reargument and disposition by the state courts. Grundler v. State, 283 F.2d 798 (4 Cir. 1960). However, I find that arguments 4 and 7 were not directly considered by the Delaware Supreme Court. Were they meritorious, I would remand to the State Court for consideration and disposition. But for reasons later to be stated, I have concluded that they will not support the grant of a writ of habeas corpus and, therefore, see no reason to withhold decision. United States v. Myers, 327 F.2d 174, 182–183 (3 Cir. 1964).

MERITS

█ Before proceeding to a disposition of the several grounds for relief, it is proper to remind petitioner that a federal district court does not sit in a habeas corpus proceeding as some sort of super supreme court for the purpose of reviewing the rulings of state supreme courts which have affirmed their lower courts. Habeas corpus is not a substitute for a writ of error or an appeal. It is not the means to test ordinary procedural errors at trials. The function of this Court is much more limited. Habeas corpus in a federal court in a case such as this is available only where the state criminal proceeding fails to meet the standards of procedural fairness which the Fourteenth Amendment demands of the states. It is by this test that petitioner's arguments will be judged.

1) The wrongful display of the wine bottle

█ Police testimony was to the effect that petitioner was found drunk, slumped over the wheel of his parked car with an empty wine bottle at his feet. During the trial, an empty wine bottle was marked by the State for identification, allowed to sit on a table in front of the jury but not offered into evidence. Next day petitioner's attorney moved that it either be offered or removed from the jury's view. The prosecutor agreed that the bottle could be removed because he felt he did not have the necessary witnesses to get it into evidence.[1] Conceding arguendo that the display of the empty bottle, knowing that it would be impossible to get it into evidence, was improper, it does not follow that petitioner was denied due process of law. At that point the trial judge, at petitioner's request, charged the jury fully and fairly that it should wholly disregard the presence of the wine bottle as having any relevance to the case and to strike its existence from their minds. Having done so, he asked defense counsel,

"Does that satisfy you now [Mr. Knecht]?

Mr. Knecht [defense counsel]: 'Yes, Sir'." (Trial Record at 278.)

This ground of contention is without merit.

2) The failure to warn jurors not to read the newspaper accounts of the trial

█ During the course of the trial, eight newspaper articles about it appeared in either the morning or evening newspapers or both. None was inflammatory. None was sensational. Each article except one stated that petitioner was being retried after his original jury conviction was set aside by the Supreme Court of Delaware because of errors in the charge by the trial judge. One article stated, however, that petitioner "obtained a new trial on technical grounds." It is to this article that petitioner registers his principal objection.

---

1. This may or may not have been the same bottle. On reading the record, it may be surmised that it probably was, but due to the long delay between trials, the necessary evidence to establish the chain of hands through which it had passed since first being found on October 18, 1959, on through the first trial in 1963 and up to the second trial had apparently become lost.

The trial judge was most careful to admonish the jury on numerous occasions that it should not discuss the case with anyone or permit anyone to discuss the case with them and to reserve opinion until the end. Typical of his warnings was this:

"THE COURT: We will recess now until 2:15.

"Now, Members of the Jury: I want to stress this to you; it is important so that you will understand what I say.

"Please, in the interests of justice, do not draw any opinion now. Do not take any stand with respect to what will be the ultimate issues in this case. I will ask that you not even discuss the case among yourselves until the case is submitted. We all want fair play from the side of the State and from the side of the defendant. Every coin has two sides. You can't tell what is on one side until you turn the thing over and see, and that is why I stress at this stage of the case and I ask that this be kept in mind throughout, that you do not take a position, one way or the other, until the case is submitted to you after argument by counsel and the Charge by the Court.

"Now, in recessing this case until 2:15, you are directed that you are not to discuss the case with anybody, you are not to permit the case to be discussed in your presence, and you are under duty to the Court that, if anybody seeks to discuss it with you or insists on discussing the case in your presence, or in your hearing, you are under obligation to report back to the Court anybody and everybody who may at any point endeavor to discuss these things with you.

"Now, please keep these things in mind. We all want a fair trial, and the only way we can do it is to not discuss the case until the end.

"Recess to 2:15 P.M." (Trial Record at 58–60.)

A further admonition was made that afternoon:

"THE COURT: Members of the Jury: We will recess now until 10:00 o'clock tomorrow morning. Please keep in the mind the admonition that I gave you at the noon recess. It continues throughout the trial, the obligation to report to the Court anything that is sought to discuss the case in your company or in your presence, not only when you are together, but when you are separated, you are under obligation to report to the Court." (Id. at 123.)

In the Court's charge, it was said inter alia:

"In deciding the questions before you you are to be controlled entirely by the evidence presented to you as it came from the witnesses who appeared before you on the witness stand and by the exhibits which have been received in evidence * * *." (Id. at 642.)

Instructions of this sort were repeated or referred to throughout the trial.

Presumably, because defense counsel was not aware of these articles during trial, their existence was not called to the attention of the trial judge and he, of course, did not warn the jury against reading newspaper accounts of the trial. Some days later, on motion for a new trial, however, the existence of the articles was made the basis for one of the grounds for new trial. The trial judge did not recall the jury and poll each one individually as to whether or not he had read one or more of the articles and, if so, been influenced by them. It remains, then, that the record is completely silent on the question whether any of the jurors had read one or more of these articles and, if so, whether petitioner was in any way prejudiced.

Certain preliminary observations should be emphasized. First, all the jury knew this was a retrial because this fact was brought out by the cross-examination by defense attorney of prosecution witnesses referring to testimony in the

former trial. Every article but one stated that the reason for the new trial was due to erroneous instructions by the trial judge at the first trial. It is nearly impossible to conduct a new trial without the existence of the fact being made known to the second jury. The moment the jury learns of the former trial, they will inevitably begin to speculate why a new trial was granted. Seven of these articles stated why. Any intelligent juror would decide, I think, that if the former jury were improperly instructed on the law, that jury's verdict of guilty might well have been influenced by the erroneous instructions. Accordingly, an intelligent juror, informed of the reasons for the new trial, would not be prejudiced by knowledge of the former verdict. Certainly, petitioner's counsel, who himself revealed the existence of the former trial, failed to ask, as he well might have, for a charge or admonishment by the Court that the jury should disregard the existence of a former trial. He also could have asked, but did not, that the jury be instructed to refrain from reading the newspaper accounts of the trial. The trial judge was careful to warn the jury that it should decide the issue based only on the evidence it heard. Very important, also, is the fact that each member of the jury received a copy of the Superior Court Handbook for Petit Jurors, with instructions from the Court to read it before reporting for duty. Among other things, this appeared:

> "Jurors must not talk about the case with others not on the jury and *must not read about the case in the newspapers. They should avoid radio and television broadcasts that might mention the case."* (Emphasis supplied.)

On occasions, federal courts have granted new trials because of prejudicial newspaper publicity during trials in federal district courts. See United States v. Accardo, 298 F.2d 133 (7 Cir. 1962); Coppedge v. United States, 106 U.S.App. D.C. 275, 272 F.2d 504 (1959). In both,

the facts reported were highly prejudicial and rather sensationally reported. And in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), a new trial was granted where prejudicial reports as to defendant's past criminal record were read by the jury. These decisions presumably represented only an exercise of the supervisory powers of the federal courts over their own trial courts.

On numerous occasions, also, federal courts have refused to grant new trials in this type of case. E. g., Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Ferrari v. United States, 244 F.2d 132 (9 Cir. 1957); United States v. Griffin, 176 F.2d 727 (3d Cir. 1949).

But no case has been called to my attention wherein a federal court has granted certiorari and reversed a state court conviction on constitutional grounds as the result of adverse newspaper publicity during the progress of a state court trial. There are cases where there was a reversal as the result of newspaper or television publicity preceding trial. Irvin v. Dowd, 366 U.S. 717, 81 S. Ct. 1639, 6 L.Ed.2d 751 (1961); Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); cf., Estes v. Texas, 85 S.Ct. 1628 (June 7, 1965). But in these cases, the publicity was sensational and inherently prejudicial.

If this were a conviction in a federal district court being reviewed by a federal circuit court under the latter's supervisory powers, it would be very debatable whether a new trial would be granted because of the restrained nature of the reporting and the extreme doubt whether anything inherently prejudicial resulted from the newspaper accounts. But there is a far cry between the exercise of the supervisory power by one federal court over another and the oversetting by a federal court of a state court conviction on constitutional grounds.[2]

2. "It goes without saying, however, that there is a very significant difference between matters within the scope of our supervisory power and matters which

The sum total of my impression from reading the briefs of counsel as well as the newspaper accounts themselves is that there was small likelihood that any prejudice resulted. Accordingly, I am of the opinion that petitioner's constitutional guarantees were not transgressed.

3) Whether petitioner was deprived of constitutional rights when he was resentenced by the Superior Court after Chap. 41, T. 21 (which included section under which plaintiff was convicted) was repealed

After petitioner's conviction at the second trial, but prior to the determination of his appeal by the Delaware Supreme Court, the Delaware Legislature repealed Chapter 41,[3] Title 21 of the Delaware Code. Petitioner contends there was no savings clause contained in the repealer and, therefore, the proceedings against him terminated. In a case involving interpretation of the same Act, the Delaware Supreme Court agreed that if the repealing act contained no savings clause, all actions which had not attained final judgment would terminate, Angelini v. Court of Common Pleas, 205 A.2d 174 (1964), but went on to decide, in my opinion properly, that Section 5 of the repealer constituted a savings clause.[4]

Moreover, the rule is that federal courts normally are bound by the interpretation by a State supreme court of the criminal statutes of its own state. See numerous authorities collected in 14 Modern Federal Practice Digest, Sec. 366 (27) at 522 et seq.[5]

There is no merit to this contention.

4) Whether petitioner was deprived of constitutional rights because the trial judge helped gather and introduce certain evidence

When petitioner was found slumped over at the wheel of his car, it was parked partly on the highway and partly on the property of a corporation of which petitioner was the sole stockholder. At a preliminary hearing on a motion to suppress evidence seized by the police without a warrant on the ground that the arrest took place off the public highway on petitioner's own property, the trial judge made some examination of the highway records as to public roads and suggested that they be introduced into evidence. This was not done at the trial of the cause. The jury knew nothing about it. While the actions of the trial judge were perhaps unusual, they did not even remotely affect petitioner's constitutional rights.

There is no merit to this contention.

5) Did the refusal by the trial judge to permit the accident reports into evidence deprive petitioner of his constitutional rights?

At the very end of his own defense, petitioner offered into evidence two police accident reports which were erroneously excluded by the trial judge. Halko v. State, 204 A.2d 631. The purpose of the offers was to attempt to impeach the credibility of certain police testimony concerning minor variances between the times of certain events testified to at the

reach the level of constitutional dimension." Justice Clark dissenting in Rideau v. Louisiana, supra, at 729, 83 S.Ct. at 1420.

3. Sec. 4111 of Chap. 41 is the provision against operating a motor vehicle while under the influence of intoxicating liquor under which petitioner was convicted. The entire chapter was repealed and a new one passed in slightly different form in order to bring the state's automobile laws up to date. As I understand it, Sec. 4111 substantially was re-enacted in 21 Del.C. § 4176.

4. Sec. 5. "This act shall not have a retroactive effect and shall not apply to any traffic accident, to any cause of action arising out of a traffic accident or judgment arising therefrom or to any violation of the motor vehicle laws of this State, occurring prior to the effective date of this act."

5. This point does not involve petitioner's conviction for driving while his license was suspended.

trial[6] and as revealed by police reports. These reports covered (1) the slight accident between the automobiles of Halko and Forestieri and (2) later on, a collision by Halko with a stop sign while Forestieri was following Halko in order to get his license number.

Petitioner cites four instances in which he says he was deprived of the right to cross-examine the police officers in an effort to impeach their credibility. They are as follows:

(a) State Police Lieutenant Allen C. Field testified (T. 396) that at 2:41 A. M. Car No. 239 had someone in the police car and was returning to Troop No. 2. However, both police reports indicate that both accidents were investigated at the scene of the accident at 3:00 A.M. One accident report indicates that the State Police were not even notified of the accident until 3:00 A.M., this being the accident at South DuPont Road and Valley Road.

(b) At T.. 166 City Police Officer Marsh states that he received a call at 1:42 A.M. pertaining to the Petitioner. The excluded police reports indicate that the first accident did not occur until 1:55 A.M. and the second accident did not occur until 2:10 A.M.

(c) State Police Officer Coleman Stoopes testified on cross-examination (T. 246) that he did not recall the time that he indicated for the first accident. Without being able to use the accident reports as a basis for cross-examining the officer, it could not be shown that he had indicated on the accident report that the first accident occurred at 1:55 A.M. The trial judge ruled that the accident reports could not be used as a basis upon which to cross-examine the police officers. (T. 561).

(d) At T. 255 State Police Officer Franklin Klair stated that he received a call concerning an accident in the vicinity of Boxwood Road and Mary-land Avenue at 2:25 A.M. The police accident reports show that the police were notified of one accident at 2:15 A.M., not 2:25 A.M. In this case, even brief periods of time are important to the alibi defense. Also, neither police officer made any reference at all to the fact that they were notified of the second accident at 3:00 A.M., and without the use of the accident reports it was impossible for the defense to show that such was the case. (Petitioner's letter of July 15, 1965, filed July 20, 1965.)

 ▆▆▆ As to (a), there was no basis for impeachment on cross-examination. Lieutenant Field was merely the custodian of the records. He did not receive the telephone call from Car 229 at 2:41 A.M. and enter it into the police log. An officer named Braddock did this. Thus Field could not have been impeached as to some notation as to the time of an event received and recorded by Braddock, who did not testify in the case.

 ▆▆▆ Nor was there any basis for impeachment by cross-examination under point (b). This point concerns a discrepancy between the testimony of a city police officer, Marsh, that he received a call about Halko's alleged drunken driving from city police headquarters at 1:42 A.M. and the excluded reports of the state police officers Stoopes and Klair indicating that the first accident between Halko and Forestieri happened at 1:55 and the second accident with the stop sign at 2:10. But the times of 1:55 and 2:10 were not established by Stoopes and Field of their personal knowledge. They did not witness either accident. They established the times from information supplied by others. Trial Record at 246–47. There was no basis for impeachment on these facts.

 ▆▆▆ The same answer is applicable to (c). Officer Stoopes could not have been impeached on the time of the accident because he did not have personal

---

6. Curiously enough Halko, although in possession of these reports throughout trial, apparently did not think the vari-ances worthy of going into during the cross-examination of Officers Stoopes and Klair in the State's case in chief.

knowledge as to what time the accident occurred. The 1:55 entry in the accident report was based on hearsay and conjecture.

■ The situation revealed in (d) forms the only possible basis for impeachment by cross-examination but the discrepancy is utterly trivial. Petitioner contends that Officer Klair testified he received a call concerning an accident on Boxwood Road (between Halko and Forestieri) at 2:25 A.M. while his report shows the time to have been 2:15, a difference of 10 minutes. But even this is not correct. Klair did not place the time of the telephone call at exactly 2:25 but, in response to a leading question, at *approximately* 2:25:

> Q. "Did you at *approximately* 2:25 that morning receive a call from Troop 2 concerning an accident in the vicinity of Boxwood Road * * * ?"
>
> A. "Yes, Sir." (My emphasis.)

■ Conceding the great importance of the right to full cross-examination, United States v. Cardillo, 316 F.2d 606 (2d Cir. 1963), it must be subject to some limitations. Here a police officer, several years after the event and without the benefit of anything to refresh his recollection, simply answered yes to a time approximated by counsel in a leading question whereas his report excluded from evidence, would have shown a variance of 10 minutes. Certainly, 2:15 is approximately 2:25. I see no constitutional question here.

There remains one possible argument which petitioner has failed to advance. Aside from the right to impeach by cross-examination, were petitioner's constitutional rights infringed by the mere fact of the erroneous exclusion of these two reports from the evidence? It could be argued that were the reports admitted, standing alone and without further clarification they would have revealed several variations between times of events established by the reports and as testified to from the stand with the result that the jury, subject to comment by petitioner's counsel in his jury summation, should have been permitted to hear these discrepancies and evaluate their weight in arriving at their verdict. There are several reasons why I disagree with this potential argument.

■ First, as already remarked, federal courts on habeas corpus do not sit to correct procedural errors in state court proceedings. Only in situations where the error was of such consequence as to approach constitutional dimensions will a federal court intervene. I see no such grave implications flowing from this error.

Secondly, had the reports been admitted, the variances, even though unexplained, would have been minor in character.

Thirdly, if the reports had been admitted, the discrepancies would undoubtedly have been fully explained. Even without fuller explanation, the reading of the whole record reveals pretty clearly what the explanation would have been. For instance, it is obvious from the record that the time of 3:00 A.M., when the police say they were notified of the stop sign accident, requires explanation. Otherwise, it might appear that this accident happened *after* the officers arrived on the scene of Halko's parked car somewhere around 2:40 A.M., whereas we know it happened before. This is the probable explanation. While the state troopers were notified by telephone of the accident between Halko and Forestieri, they knew nothing about the stop sign accident until *after* they arrived at Halko's parked car. There they found two city officers, a Mr. Perry, and Mr. Forestieri. It was then that they learned from Forestieri of the minor stop sign accident. Apparently, then, Officer Stoopes wrote up his police report on this accident during his conversation at Halko's car from information learned from Forestieri at that time, by then about 3:00 A.M. In fact, Stoopes did not physically investigate the bent stop sign until 4:30 A.M. This could also explain why the police log showed Halko had been taken into custody at 2:41 while the accident

reports showed that they were not investigated until 3:00 A.M. What probably happened is that the state troopers arrived at Halko's car about 2:40, after a minute or two carried or assisted him to their police car and phoned headquarters at 2:41,[7] then delayed for ten minutes or so getting all the information as to the two preceding accidents from Forestieri and entering it into their reports. (Trial Record at 161,258.) The remaining variances are explained by the fact that the times of the two accidents stated in the police reports were not established by the police from personal knowledge but from information supplied by Forestieri. Thus viewed, any slight remaining variances would represent normal error in the estimation of times of events by several different people involved in an incident wherein exact times were not of the essence.

Fourth, in any event, the discrepancies in the police reports concerned immaterial matters. The main issues were (1) Forestieri's story that he saw Halko operate his car on the highway in a weaving manner together with the police testimony that he was drunk, and (2) Halko's alibi that he never drove his car that evening at all. Thus, discrepancies in the police reports had to do with collateral matters.

Taken as a whole, and bearing in mind that this is not a review by a federal court under its supervisory powers of a federal district court trial, I conclude that the error in excluding the two police reports neither deprived petitioner of the right of cross-examination nor constituted error even approaching constitutional dimensions.

6) The evidence upon which petitioner was convicted was illegally obtained and should have been suppressed

The Delaware Supreme Court in Halko v. State, 175 A.2d 42 (S.Ct.Del. 1961) considered this question at length and concluded that under the circumstances, the Uniform Arrest Act (11 Del. C. Sec. 1902) was applicable, that the petitioner was lawfully detained and that such detention constituted a valid "arrest upon view." In my judgment, the Delaware Supreme Court was correct. It would necessarily follow, then, that the search of petitioner's car and person was pursuant to a lawful arrest and, consequently, the evidence was lawfully seized.

But whether or not correct, the United States Supreme Court would be bound by the interpretation placed upon a Delaware statute by the highest court of that state unless the invasion of petitioner's privacy was so unreasonable as to have violated concepts of due process guaranteed by the Fourteenth Amendment. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Whether or not the arrest in this case was reasonable is not a matter governed by exact standards; and this having been a state proceeding, the standards would presumably be less exacting than demanded on a review by a federal circuit court of a federal district court proceeding under its supervisory powers. Ker v. State of California, supra, at 33, 83 S.Ct. 1623.

Here, as the Delaware Supreme Court pointed out, 204 A.2d at 629, we have petitioner's automobile parked in front of his place of business (not his home) at somewhere between 2:45 and 3:00 A.M. in the morning, with the lights on. He is slumped over the wheel. He does not react to calls or knocking upon the door of his car. Either he is deathly ill or drunk. He has been positively identified by a person at the scene (Forestieri) as having earlier driven his car in a manner indicating drunkenness. If ill, he demands immediate attention; if drunk, and the police take an hour or more obtaining a warrant (possible at this hour of the night), then he might sober up to the extent that evidence of drunkenness will have become lost.

Under such circumstances, I conclude (1) that the Delaware Supreme Court correctly interpreted the actions of the

---

7. Neither officer was asked about or made any comment about this call during the trial.

State police as constituting a valid arrest within the purview of Sec. 1902 and (2) the facts giving rise to the search and seizure were not so unreasonable [8] as to demand interference by a federal court on the grounds of lack of due process.[9]

7) Petitioner was illegally detained, not advised of the charges against him, was not taken to the nearest magistrate and was held incommunicado, all in violation of his constitutional rights

These arguments are no more than a rehash of a number of petitioner's earlier contentions and might well be dismissed out of hand. However, the facts of the case are such as to justify some comment. Petitioner complains that he was illegally detained, illegally arrested, held incommunicado and not taken before a magistrate and charged.

When the police place a drunken person in a passed-out condition in a cell, are they unlawfully detaining him and are they holding him incommunicado? Petitioner fails to explain just how a person can be advised of the charges against him or taken before a magistrate and formerly charged when he is in such a state of intoxication as to be unable to understand what is going on. Such arguments are manifestly absurd. Torn between their duty to protect the public from crime, including the hazards of drunken driving on the one hand and the ever-increasing liberality of the interpretations by the federal courts of the constitutional rights of individuals, the lot of the police is not enviable.

8. Compare the arbitrary and outrageous actions of the police in Irvine v. People of State of California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), and Rochin v. People of State of California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

9. It is proper to point out here also that the case at bar occurred prior to the date of Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and at a time when Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) was the law. Mapp does not have a retro-

After reviewing the entire record, it is my conclusion that none of the actions by the police and none of the procedural errors occurring during the course of the second trial were of constitutional dimension.[10] The writ will be denied.

active effect. Linkletter v. Waller, 85 S. Ct. 1731 (S.Ct., June 7, 1965). Clearly the search and seizure in the case at bar was not a violation of due process prior to Mapp. Compare Irvine v. People of State of California, supra, with Rochin v. People of State of California, supra.

10. As I view petitioner's grounds for habeas corpus, only one, the second point, concerns his conviction for driving during a period while his license was suspended. The remaining six all deal with his conviction for driving while under the influence of intoxicating liquor.