**UNITED STATES of America ex rel. John E. GARRETT, Jr., Petitioner,**

**v.**

**Raymond W. ANDERSON, Warden, Delaware Correctional Center, Respondent.**

Civ. A. No. 74–200.

United States District Court, D. Delaware.

March 21, 1975.

insanity, deprived petitioner of his constitutional right to due process of law; and second, he contends that the standard of review enunciated by the Delaware Supreme Court in *Garrett* for determining whether a trial court abused its discretion by denying a bifurcated trial deprived petitioner of his constitutional right to equal protection of the law.

On appeal to the Delaware Supreme Court, petitioner argued that the principles of fundamental fairness essential to the very concept of justice require that a defendant in petitioner's situation be granted a bifurcated or sequential trial and that the Superior Court's decision to proceed with a unitary trial therefore constituted an abuse of discretion. Although petitioner did not raise the precise argument presented here, viz., that due process requires a bifurcated trial, the arguments made to the state court were based on the same facts asserted here and those arguments were so similar to the due process argument presented here, the Court concludes that petitioner has exhausted available state remedies with respect to that issue, and thus that issue is properly before this Court. United States ex rel. Brown v. Hendrick, 431 F.2d 436, 438 (C.A.3, 1970) cert. denied 402 U.S. 976, 91 S.Ct. 1677, 29 L.Ed.2d 141; Kanieski v. Gagnon, 427 F.2d 401, 404 (C.A.7, 1970); 28 U.S.C. § 2254(b).

However, petitioner's equal protection argument is not based on the constitutionality of the state trial court's decision to deny bifurcation and the factual circumstances surrounding that decision, but rather is based on the language used by the Delaware Supreme Court in the *Garrett* decision and the assertion that that language creates a classification which is impermissible under the equal protection clause of the Constitution. Petitioner has never presented this constitutional issue to the Delaware court system for resolution in spite of the fact that Rule 35(a), Delaware Superior Court Criminal Rules, Del.C.Ann.,

Jack B. Jacobs and James B. Tyler, III, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for petitioner.

John M. Willard, Deputy Atty. Gen., Wilmington, Del., for respondent.

## OPINION AND ORDER

LATCHUM, Chief Judge.

John E. Garrett, Jr., a state prisoner and the petitioner in this habeas corpus proceeding, was convicted by a jury on April 9, 1973, in the Superior Court of the State of Delaware of murder in the second degree. Thereafter, he was sentenced to life imprisonment. His conviction was affirmed by the Delaware Supreme Court on April 25, 1974. Garrett v. State, 320 A.2d 745 (Del.Sup.1974).

Here petitioner raises two points: first, he contends that the refusal of the state trial court to grant bifurcated or sequential trials on the issues of petitioner's guilt on the merits and petitioner's defense of not guilty by reason of

allows for such a state court review.[1] Accordingly, petitioner has not exhausted available state remedies on the issue of whether or not the *Garrett* decision violates the equal protection clause of the Constitution and, thus, that issue is not properly before this Court and will not be considered. Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

■ Briefs have been submitted and carefully reviewed. Since the briefs extensively cover the only issue properly before this Court, no oral argument is necessary. No evidentiary hearing was requested or held because the application for the writ presented only issues of law. 28 U.S.C. § 2254.

From the state trial record the following pertinent facts emerge: on the evening of February 4, 1972 the body of Grace Mack ("Mack"), a Negro prostitute, was found on the first floor of the building where she lived.[2] Petitioner was arrested on February 12, 1972 for the murder of Mrs. Mack,[3] and thereafter he entered separate pleas of not guilty and not guilty by reason of insanity.[4]

In response to petitioner's discovery request, the state reported that when interviewed by the police, petitioner stated he did not remember what happened on the night of the murder. He admitted picking up a Negro female that night, and later washing his hands at a service station, but he remembered nothing of what occurred during the time between those two events. In addition, at one interview petitioner said he thought he could be responsible for the murder and at another interview he said that he thought he did it. This information was revealed to the petitioner by letter dated June 14, 1972.[5]

On August 11, 1972, petitioner moved the state court requesting a bifurcated trial or, in the alternative, sequential trials on the separate issues of guilt on the merits and insanity.[6] Petitioner argued in support of his motion that by pleading not guilty on the merits and not guilty by reason of insanity at a unitary trial he would render both defenses incredible in the minds of the jurors. Petitioner also argued that the intermingling of evidence of insanity with evidence of guilt would fatally prejudice his defense on the merits.

Petitioner supported his motion with the following factual assertions: discovery and independent investigations developed nothing to incriminate or link petitioner to Mrs. Mack's murder; petitioner had no memory of what he did on the night in question; and at least one psychiatrist was prepared to testify that if petitioner committed the murder he was insane at the time. To further support his insanity defense petitioner stated he would disclose at trial his guilty plea in 1966 to a charge of manslaughter of his mother after committing incestuous relations with her and introduce photographs of Mrs. Mack's severely mutilated body to serve as a foundation for testimony concerning his psychiatric state of mind.[7]

The state trial court denied petitioner's motion without any reported comment.[8] At the outset of trial, petitioner renewed his motion for a bifurcated or sequential trial without introducing any additional discussion or factual assertion. The trial court adhered

---

1. It may be that the Superior Court, rather than ruling on the equal protection issue in the first instance if presented, will choose to certify the question to the Delaware Supreme Court pursuant to Rule 20, Delaware Supreme Court Rules.

2. Trial transcript (Tr.) 44–45, 217, 221 and State's Exhibits 7–11.

3. Tr. 427, 465.

4. State Docket Item 27, and *Garrett*, 320 A. 2d at 746.

5. Docket Item 21.

6. Docket Item 14, p. DA4.

7. Docket Item 14, pp. DA4–DA8.

8. State Docket Item 35.

to its prior decision and denied the renewed motion.[9]

At trial, state witness Mary Thomas ("Thomas") testified that on the night Mrs. Mack was murdered, she heard someone run past her apartment and holler for "help" and heard a struggle in the hallway.[10] She went out into the hall, looked through a firedoor window and saw the back of a man bent over someone lying on the floor at the spot where Mrs. Mack's body was later discovered. Thomas testified that the man appeared to be doing something with his hands.[11] While she only saw the man's ears and maybe the top of his forehead[12] she did see that he was wearing a plaid hunting jacket.[13] She testified that the jacket she saw looked like petitioner's jacket[14] and she identified petitioner as looking like the man she saw.[15]

State witness Dolores Wharton ("Wharton") testified that moments after she discovered Mrs. Mack's body, a man with a plaid hunting jacket appeared on the scene.[16] According to Wharton, the man "acted strange" and kept his hands out of sight behind his back.[17] Wharton was unable to positively identify petitioner as the man she encountered at the murder scene,[18] but she did identify the plaid jacket the man was wearing as petitioner's jacket.[19] State witness Lane M. Feldman ("Feldman") testified that she was present with Wharton when the man with the plaid jacket appeared,[20] and Feldman identified the petitioner as that man.[21]

The state also presented the testimony of police officer Charles John Burke ("Burke"). Burke had interviewed the petitioner after his arrest and he reported that the petitioner denied involvement with the crime,[22] that petitioner told Burke he picked up a Negro female that night and the next thing he remembered was being at a service station washing *blood*[23] off his hands,[24] and that petitioner admitted to Burke he could have done it but he just did not remember.[25] After the state rested, petitioner informed the court he would present evidence in support of the defense of not guilty by reason of insanity. Because petitioner's counsel had made no mention of this defense during his original opening statement to the jury, the trial court inquired whether petitioner desired to make an introductory statement to the jury at that time so they would understand what petitioner was attempting to prove.[26] Petitioner's attorney stated he did not intend to make any such remarks,[27] and merely requested the court to briefly instruct the jury that the defense of mental illness would be presented. This the court did.[28]

Petitioner proceeded to present no testimony or other evidence directed toward proving his innocence of the homicide, but instead called two doctors one of whom testified as to his impression of petitioner's mental condition on the

9. Tr. 17.

10. Tr. 152–54.

11. Tr. 155–58.

12. Tr. 158–59.

13. Tr. 159.

14. Tr. 160, 491.

15. Tr. 162–63.

16. Tr. 233.

17. Tr. 233, 240.

18. Tr. 236.

19. Tr. 237.

20. Tr. 260–62.

21. Tr. 264–65.

22. Tr. 610.

23. Burke also testified that there was no written report or notation reflecting that petitioner had said he remembered washing *blood* off his hands at the service station. Tr. 612.

24. Tr. 610.

25. Tr. 610.

26. Tr. 622.

27. Tr. 624.

28. Tr. 660.

night of the murder. The state called one doctor as a rebuttal witness to the petitioner's defense of insanity.

During summation to the jury, petitioner's counsel stated:

"Now, the State did put in evidence which linked John Garrett to this crime, there's no doubt about it, and I'm not going to waste your time arguing that there's something wrong with that evidence or that you shouldn't find that he committed the killing. I think that would be a waste of your time and an insult to your intelligence. What I plan to do for the rest of this summation is to talk about the heart issue, the real issue in the case, and that is whether at the time John Garrett, if you find that he did this, was insane." Tr. 914–15.

Thereafter, the jury returned a verdict of guilty of murder in the second degree.[29]

### Right To Separate Trials

Petitioner argues that by being restricted to a single trial, he was effectively compelled to choose between a defense of not guilty of the homicide and a defense of not guilty by reason of insanity and that putting petitioner to that choice in a unitary trial denied him his constitutional right to due process of law.

The theory behind petitioner's argument is that he had a right to present a defense of not guilty by reason of insanity, and a separate right to require the state to prove beyond a reasonable doubt his guilt of the homicide. However, petitioner contends that the evidence on the issue of insanity was so convincingly prejudicial to petitioner's assertion of innocence that by putting the insanity evidence before the jury, petitioner in effect proved his own guilt on the merits. In addition, to have argued innocence after such evidence was introduced would have fatally jeopardized petitioner's overall credibility with the jury.

As a consequence, petitioner asserts that he was faced with the unenviable predicament of deciding between forgoing his insanity defense or conceding his guilt of the offense charged.

■ Petitioner's argument must first be placed in the proper perspective. This is a petition for habeas corpus relief. As such, it is not an appropriate forum for arguing the abstract desirability of having separate as opposed to unitary trials. Such debate is better left to the chambers of legislatures. In this proceeding the only concern is that petitioner was accorded his constitutional rights since state prisoners are entitled to habeas corpus relief only if their detention violates the fundamental standards or procedural fairness which the Fourteenth Amendment demands of the states. Halko v. Anderson, 244 F. Supp. 696, 700 (D.Del.1965), aff'd 359 F.2d 435 (C.A.3, 1966) cert. denied 385 U.S. 833, 87 S.Ct. 72, 17 L.Ed.2d 68.

Accordingly, for purposes of this petition, the Court need not decide whether a bifurcated or sequential trial would have provided a more desirable mode of effecting criminal justice. Instead, the Court is limited to the narrower question of whether bifurcated or sequential trials are required by the Constitution.

McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) appears as the seminal Supreme Court case on the constitutionality of requiring criminal defendants to make difficult decisions on trial court tactics. In McGautha the appellant was faced with a state procedure requiring that the issues of guilt on the merits, insanity, and degree of punishment all be presented, if ever, to the same jury at a single trial. Appellant argued that he desired to invoke his constitutional right not to be compelled to be a witness against himself, but that he could do so only by forgoing any chance to plead his case on the issue of punishment. Appellant asserted that putting him to this choice created an intolerable tension between

constitutional rights which could have been avoided by a bifurcated trial.

In disposing of this issue, the Supreme Court said:

"The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. McMann v. Richardson, 397 U.S. at 769, 90 S.Ct. 1441. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. *The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.* Analysis of this case in such terms leads to the conclusion that petitioner has failed to make out his claim of a constitutional violation in requiring him to undergo a unitary trial." 402 U.S. at 213, 91 S.Ct. at 1470. (Emphasis added).

■ Analysis of the present case in such terms also leads to the conclusion that the present petitioner likewise has failed to make out his claim of a constitutional violation in requiring him to undergo a unitary trial. In effecting this analysis it is important to identify with particularity the rights which are involved. In the present case, petitioner's contention is that the evidence needed to raise an insanity defense unduly compromised the case on the merits. Thus, the rights asserted here may be categorized as a "right" to present an insanity defense and a "right" not to incumber one's own defense on the merits. The policy behind the first right is basically that persons who do not have the requisite mental capacity to establish *mens rea* should not be convicted of a crime. Davis v. United States, 160 U.S. 469, 484–85, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

The policy behind the second "right" is more difficult to ascertain. Petitioner argues in effect that this second "right" includes the constitutional privilege against self-incrimination and accordingly should be judged by the policies behind that privilege. However, the Supreme Court has already found that the policies behind the privilege against compulsory self-incrimination are but remote support for the proposition that defendants should be permitted to limit the effects of their evidence to a particular issue. McGautha, 402 U.S. at 214, 91 S.Ct. 1454.

Petitioner further argues that by being forced to incumber his own defense on the merits he was in fact forced to forgo his right to be heard on his defense of not guilty, his right to a presumption of innocence, and his right to confront witnesses because the evidence connected to his insanity defense assured a finding of guilt on the merits. It is indeed difficult to perceive what policy behind any of these rights is impaired to an "appreciable" extent by conditioning the presentation of an affirmative defense of insanity on the requirement that a defendant, by exposing to the jury evidence of insanity, risks the consequences of having the jury consider that evidence to be probative of the issue of guilt. To the extent the additional evidence is relevant to the issue of petitioner's guilt, its admission furthers a basic policy of our criminal justice system to seek out the truth. To the extent the additional evidence is emotionally prejudicial to petitioner but not probative of his involvement with the particular crime in question, petitioner is required to trust the ability of juries to approach their task responsibly and limit evidence to its rightful purpose. Spencer v. Texas, 385 U.S. 554, 565, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); *McGautha, supra.*

While at times it may be undeniably hard to require a defendant on trial for a crime who desires to present a defense of insanity to make nice calculations of the effect the evidence of his insanity will have on the jury's determination of his guilt, criminal defendants and their attorneys are quite routinely faced with analogous choices.

■ For example, in order for a defendant to assert his good name as a defense, he must risk throwing open the entire subject of his good character which the law had otherwise kept closed for his benefit. Michelson v. United States, 335 U.S. 469, 479, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Also, a defendant's choice to testify in his own behalf is complicated by the detriment of introducing otherwise inadmissible character evidence which is damaging to his case. McGautha, 402 U.S. at 213, 91 S.Ct. 1454. In a similar vein, in some jurisdictions, a defendant must admit guilt of the crime before allowed to assert a defense of entrapment. Kibby v. United States, 372 F.2d 598, 600–01 (C.A.8, 1967), cert. denied 387 U.S. 931, 87 S.Ct. 2055, 18 L.Ed.2d 993. Just as it is not unconstitutional to require defendants to weigh such pros and cons in deciding whether to put their character into issue, testify on their own behalf, or assert a defense of entrapment, neither is it unconstitutional to require petitioner to weigh the pros and cons of presenting a defense of insanity.

This Court is aware of no case wherein a federal court has held that a bifurcated trial on the issues of guilt or innocence and insanity was required by the Constitution. To the contrary, the Supreme Court has stated:

"Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law or even as a matter of federal procedure." Spencer v. Texas, 385 U.S. 554, 568, 87 S.Ct. 648, 656, 17 L.Ed.2d 606 (1967).

The Fifth Circuit Court of Appeals, when faced with this issue in United States v. Huff, 409 F.2d 1225 (C.A.5, 1969) cert. denied 396 U.S. 857, 90 S.Ct. 123, 24 L.Ed.2d 108 expressly found:

"We know of no constitutional or statutory provision which requires the trial judge to hold a two-part jury trial on the issues of guilt or innocence and mental incompetency at the time of the commission of the alleged crime." 409 F.2d at 1228.

The Fifth Circuit confirmed this conclusion in Murphy v. State of Florida, 495 F.2d 553 (C.A.5, 1974) where it was stated:

"Finally, we agree with the holding below that the final ground of attack, the refusal of the state trial court to grant a bifurcated trial on the issues of guilt or sanity, does not rise to constitutional dimensions. Due process does not require a separate trial and the states and their courts are free to determine whether such issues should be tried separately or together." 495 F.2d at 557.

The Tenth Circuit Court of Appeals has also been faced with the same question. That court wrote in Garrison v. Patterson, 405 F.2d 696 (C.A.10, 1969) cert. denied 404 U.S. 880, 92 S.Ct. 214, 30 L.Ed.2d 161 that:

"The second issue heretofore considered by this court relates to the procedure used to determine appellant's sanity wherein the insanity issue was tried simultaneously with the murder charge. Bell v. Patterson [402 F.2d 394 (C.A.10, 1968)] determined the issue of a two part trial not being required as a matter of constitutional law . . . ." 405 F.2d at 697. (Brackets added.)

In Bell the court had held that inasmuch as two part jury trials have never been compelled as a matter of constitutional law, there is no constitutional basis to intervene in a state court system which grants a trial court complete discretion in determining whether or not to require bifurcated trials on the issues of insanity and guilt on the merits. Bell, 402 F.2d at 399.

In conformity with these cases and in light of the test laid down in McGautha, this Court concludes that there is no constitutional right to a bifurcated or sequential trial to allow the petitioner to present a defense of insanity separately from a trial on the merits of his guilt or innocence.

Accordingly, petitioner's application for a writ of habeas corpus will be denied.